**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

REGINALD McFADDEN,

                     Plaintiff,

      v.                                                              No. 03-CV-931
                                                 (GTS/DRH)
RICHARD ROY; ANTHONY ANNICCI;                              (Lead Case)
DEBORAH JARVIS, IRC; and GLENN S.
GOORD,

                     Defendants.

_____

REGINALD McFADDEN,

                     Plaintiff,

      v.                                                              No. 04-CV-799
                                                 (GTS/DRH)
KANG M. LEE, M.D.; ANTHONY ANNUCCI;                       (Member Case)
T. TEDFORD; DALE ARTUS; T. TAMER,
Sergeant; A. TOUSIGNANT; S. MILLER;
MICHAEL GORDON; J. LAREAU, Sergeant;
D. LUCIA, Sergeant; LINDA KLOPH;
SERGEANT BERNARD, SHU; M.D. DAVID
O'CONNELL; and LOIS CROTTY, Infection
Control Nurse,

                     Defendants.

_____

**APPEARANCES:**                                   **OF COUNSEL:**

REGINALD McFADDEN
No. 95-A-6279
Plaintiff Pro Se
Auburn Correctional Facility
Post Office Box 618
Auburn, New York 13021

HON. ANDREW M. CUOMO                        KELLY L. MUNKWITZ, ESQ.
Attorney General for the                          Assistant Attorney General
   State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

Plaintiff pro se Reginald McFadden ("McFadden"), an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings these consolidated actions pursuant to 42 U.S.C. § 1983 alleging that defendants, nineteen DOCS employees,[2] violated his constitutional rights under the First, Eighth, and Fourteenth Amendments. Presently pending is defendants' motion for summary judgment in both actions pursuant to Fed. R. Civ. P. 56. Docket No. 169. McFadden cross-moves for summary judgment. Docket Nos. 177, 178. For the following reasons, it is recommended that defendants' motion be granted and McFadden's cross-motion be denied.

### I. Background

The facts concerning McFadden's multiple claims are related herein in the light most favorable to McFadden as the non-moving party. See Section II(A) infra.

---

[1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

[2] McFadden named fifty defendants in McFadden v. Roy, No. 03-CV-931 (GTS/DRH) ("McFadden I" or 'Lead Case"). The claims against all but the four above-captioned defendants were previously terminated. McFadden named twenty-two defendants in McFadden v. Lee, No. 04-CV-799 (GTS/DRH) ("McFadden II" or "Member Case"). The claims against seven were previously terminated and the case remains pending against the fifteen above-captioned defendants. The docket in the Member Case incorrectly reflects that defendants Selsky, Brown, and Wright remain as defendants. However, those three defendants were terminated from that action. Docket No. 130. The Clerk shall amend the docket to so reflect. Unless otherwise indicated, all references to docket entries are to the docket in the Lead Case.

## A. Medical Treatment

McFadden alleges a variety of medical conditions in relation to his claims of deliberate indifference in violation of the Fourteenth Amendment.

### i. Tuberculosis and Hepatitis C[3]

McFadden tested negative for tuberculosis in September 1994. Docket No. 177-3 at 5-6; Docket No. 178-6 at 18; see also Docket No. 177-4 at 22 (indicating that McFadden had no history of tuberculosis or hepatitis). However, on September 8, 1995, McFadden tested positive for tuberculosis. Docket No. 177-3 at 5, 45. That same day, McFadden exhibited elevated liver function of 58, a moderate number of bacteria, and epithelial cells in his urine. Id. at 67. On or about September 15, 1995, McFadden began a treatment regimen ("INH") for the tuberculosis to be administered biweekly in thirty doses. Docket No. 177-4 at 7, 18-19. On one occasion during McFadden's course of treatment, he refused the INH because it caused nausea and vomiting. On or about October 27, prior to the treatment's conclusion, McFadden was discharged from the regimen. Id. at 17-18, 42-43. The reason cited for discontinuance was McFadden's elevated liver function tests. Docket No. 177-3 at 7.

------------------------

[3] On March 21, 1999, DOCS released the first Hepatitis Practice Guideline, which identified inmates with a history of intravenous drug use as at high risk for Hepatitis C. Docket No. 178-4 at 38. The initial guideline also recommended that patients with liver function enzyme tests which were elevated 1.5 to 2 times the normal level (45) on three different occasions, eight to twelve weeks apart, should be "strongly considered" for hepatitis screening. Id.; Miller Decl. (Docket No. 169-15) ¶ 45. Levels were deemed elevated in the range of 67.5 to 90. In 1995, McFadden's liver enzyme levels were not high enough to trigger alarm. Miller Decl. ¶ 45. However, the diagnosis of tuberculosis, highly infectious and more life threatening than hepatitis, led DOCS medical staff to focus primarily on treating the tuberculosis from 1995 to 2001. See Miller Decl. ¶ 46.

On November 6 and 14, 1995, McFadden refused to have his blood tested.  Id. at

43.  McFadden's blood was tested again on December 7, 1995, showing elevated liver

function levels of 50.  Docket No. 178-6 at 17.  McFadden began the INH treatment again

on December 29, 1995 but refused to continue the treatment on January 12, 1996 because

of the side effects, choosing instead to pursue religious fasting.  Docket No. 177-3 at 42;

Docket 178-6 at 21.  On November 20, 1996, McFadden wanted to re-commence the INH

treatments but refused to allow the medical staff to examine him, a prerequisite to

treatment.  Docket No. 177-3 at 40.

On or about October 8, 1997, defendant Crotty recommended evaluating

McFadden's ability to be compliant with the INH treatment, submitting to an HIV

examination, and attending health counseling pursuant to DOCS guidelines.  Docket No.

177-3 at 38.  McFadden complained about vomiting and weight loss in March 2000.  Docket

No. 177-3 at 37.  On April 26, 2000, McFadden was counseled concerning his positive

tuberculosis test, his current health status, its implications, his diagnostic testing needs, the

necessary prescriptions and the potential side effects, and the consequences to his health if

he continued to ignore the tuberculosis.  Docket No. 177-3 at 37.  While McFadden stated

that he wanted to undergo treatment, he emphasized that he was scared that the

corrections officers were conspiring against him.  Id.  The consulting infection control nurse

offered to follow his care personally, but McFadden still refused the offer.  Id.

McFadden re-commenced the INH treatment on August 11, 2000.  Docket No. 177-3

at 35.  Blood tests were completed on August 24, 2000, again showing an elevated liver

function level of 58.  Docket No. 177-3 at 65.  A month later, on September 20, 2000, blood

test results showed liver function levels of 61.  Docket No. 177-3 at 66.  On November 14,

4

2000, McFadden refused to sign forms consenting to a liver profile until he received the results from the prior blood tests.  Docket No. 177-3 at 64.  On January 8, 2001, McFadden commenced a short course therapy of a different drug regimen ("Refampin").  Docket No. 177-3 at 7, 33.  McFadden's HIV test was negative.  Id. at 33.  On January 12, 2001, McFadden's liver function test was slightly elevated at 42.  Docket No. 177-3 at 63.

On February 1, 2001, McFadden was placed on a tuberculosis hold.  Docket No. 177-3 at 7.  The medical staff then determined that McFadden did not have multiple drug resistant tuberculosis, but McFadden could not tolerate the side effects of the INH treatment and was treated with Refampin.  Docket No. 177-5 at 48; see also Docket No. 177-3 at 33 (noting that on or about February 10, 2001, McFadden believed he had multiple strain resistant tuberculosis).  On February 15, 2001, McFadden complained that he was not properly being treated by the medical staff while he was on Refampin.  Docket No. 177-3 at 32.  When medical staff attempted to probe his concerns and current physical state, McFadden refusing to speak with anyone but infection control personnel.  Id.

By February 22, 2001, McFadden was refusing Refampin, claiming that it was causing urinary problems and kidney pain.  Id.  McFadden stated that he would continue taking Refampin until March 8, 2001.  Id.  On March 2, 2001, after fifty-three days, the Refampin treatment was discontinued.  Docket No. 177-3 at 7-8.  Defendant Klopf indicated that she would attempt to persuade McFadden to finish the final seven days of treatment, potentially freeing him from the confines of the tuberculosis hold.  Id. at 7-8; Docket No. 178-6 at 22.  By April 27, 2001, McFadden completed the Refampin treatment.  Docket No. 177-3 at 31.

On June 7, 2001, McFadden's liver enzymes were again elevated to 59.  Docket No.

5

177-3 at 60.  On July 19, 2001, McFadden refused both to undergo a liver profile or to sign the refusal of consent and treatment form.  Docket No. 177-3 at 59.  McFadden again refused the liver profile and blood work on September 25, 2001, stating that he planned to refuse all further blood work.  Docket No. 177-3 at 58.

On January 10 and February 21, 2002, McFadden again refused to consent to blood work and a liver profile.  Docket No. 177-3 at 54-57.  On March 14, 2002, blood panels showed McFadden's liver function was slightly elevated at 45, he was negative for both Hepatitis A and B antibodies, and he was suffering from Hepatitis C.   Docket No. 177-3 at 54-56.  On March 22, 2002, Miller educated McFadden on the DOCS criteria for hepatitis treatment ("interferon"), the risks, benefits, and side effects associated with treatment, and strategies for healthy living.  Docket No. 177-3 at 29-30; see also Miller Decl. ¶¶ 12-15, 30.  In preparation for approval of McFadden's interferon regimen, Miller also arranged for laboratory work, blood pressure monitoring, an EKG, and a HIV test, all required by DOCS Hepatitis policy.  Miller Decl. ¶ 16; see also Docket No. 178-6 at 16 (first page of the Hepatitis treatment policy dated February 14, 2002); Docket No. 169-17 (Hepatitis treatment policy dated March 25, 2003).

On April 4, 2002, McFadden was scheduled for a pre-HIV testing counseling session, but it was cancelled because he became threatening and aggressive toward the medical staff.  Miller Decl. ¶ 17; Docket No. 177-3 at 28.  Five days later, McFadden received his HIV test.  Docket No. 177-3 at 28  A few weeks later, McFadden stated that he would not consent to any further medical treatment from a particular nurse and refused a scheduled appointment.  Id. at 27.

On May 25, 2002, McFadden asked medical staff when he would receive word on his

HIV test, acknowledging that he was inappropriate with the nurse a month earlier.  Docket No. 177-3 at 27.  McFadden expressed concern that he acquired hepatitis through his INH tuberculosis treatments.  Id.; Miller Decl. ¶ 18.  During this conversation, Miller also noted the risks, benefits, and side effects of the interferon treatment for McFadden.[4]  Miller Decl. ¶ 30.  McFadden was scheduled for an HIV test which was completed on June 6, along with the pre-testing counseling .  Docket No. 177-3 at 26.  A blood test confirmed McFadden's Hepatitis C and a slightly elevated liver function level of 46.  Docket No. 177-3 at 4, 50-51.  On June 20, 2002, McFadden received his HIV test results, which were negative.  Docket No. 177-3 at 52-53.

In January 2003, McFadden requested that Miller be prohibited from rendering him further medical care, citing her refusal to share his prior test results.  McFadden Aff. ¶ 94.  On or about March 19, 2003, McFadden was seen by a gastroenterologist who recommended commencing the interferon regimen.  McFadden refused, stating that he would pursue alternative treatment on his own.  Miller Decl. ¶ 20; Docket No. 177-3 at 22.  On May 20, 2003, McFadden was seen for consideration of a liver biopsy and hepatitis treatment.  Docket No.177-4 at 5.  Pursuant to DOCS regulations, McFadden was advised of the genotype of his hepatitis, which was genotype 1a.[5]  Id.  Miller discussed the success rate and length of treatment for his hepatitis and McFadden expressed interest in receiving a referral to discuss treatment options further  with a specialist.  Docket No. 177-4 at 5;

---

[4] Miller states that the risks, benefits, and alternatives of the interferon treatment were also discussed on October 10, 2002.  Miller Decl. ¶ 30.

[5] There is a 30% chance that patients suffering from Hepatitis C with the 1a genotype can be successfully treated.  Miller Decl. ¶ 53.

Miller Decl. ¶ 30; see also Docket No. 177-4 at 4.  However, McFadden declined the interferon and instead requested herbal alternatives, which Miller stated she could not order for him as they were not FDA-approved.  Miller Decl. ¶ 21.

In August 2003, McFadden spoke with a gastroenterologist and agreed to proceed with the liver biopsy and interferon.  Miller Decl. ¶ 22; Docket No. 177-4 at 3.  The biopsy was performed on or about December 30, 2003.[6]  Docket No. 177-3 at 69, 71; Docket No. 177-4 at 1; Docket No. 177-3 at 17-18; Miller Decl. ¶ 24.[7]  McFadden was informed of the risks and benefits of the biopsy, to which he consented, prior to the procedure.  Docket No. 177-3 at 69.  On February 22, 2004, McFadden began a hunger strike.  Docket No. 177-4 at 12.  The medical staff admitted McFadden to the infirmary for monitoring and observation.  Docket No. 177-4 at 11-12.  During the hunger strike, McFadden told the medical staff that he refused all treatment until he received his property back.  Docket No. 177-4 at 10.  On March 5, 2004, McFadden began eating again, his vital signs were stable, and he was discharged.  Docket No. 177-4 at 11-12.

On March 10, 2004, McFadden again visited the medical staff after he commenced another hunger strike.  Docket No. 178-6 at 19.  He also refused the interferon treatment citing personal safety concerns associated with potentially violent mood swing side effects.  Docket No. 178-6 at 19; Miller Decl. ¶ 25.  Miller reviewed the liver biopsy results with McFadden, who acknowledged understanding despite his hunger strike and general refusal

---

[6] It appears that McFadden did not want to remain in the medical unit for recovery.  Docket No. 177-4 at 2.  McFadden refused medical treatment, was informed that bleeding could occur at the biopsy site, but continued to request return to his cell.  Id.

[7] McFadden returned to the correctional facility with an IV still in place.  Docket No. 177-3 at 17.  Arrangements were made for the IV to be removed.  Id.

of medical treatment for that day.  Id.; Docket No. 177-3 at 16.  On March 13, 2004,

McFadden refused treatment for his hepatitis, citing a possible pending transfer.[8]  Docket

No. 177-4 at 13.  Medical staff stated that McFadden might change his mind and accept

treatment at Clinton Correctional Facility ("Clinton"), where he was then housed, or at the

next correctional facility to which he anticipated being transferred.  Docket No. 177-4 at 13.

On March 15, 2004, McFadden's treatment plan was discussed.  Docket No. 177-3

at 71.  McFadden claims that he was unable to hear the physician speaking, but the

medical records indicate that the liver biopsy was discussed and showed chronic hepatitis

with mild fibrosis, McFadden was appropriate for pharmaceutical treatment, and McFadden

should return when he could better hear.[9]  Docket No. 177-3 at 15-16, 71.

McFadden wrote to defendant Artus on April 4, 2004, regarding a grievance

pertaining to his medical care.  Docket No. 178-4 at 2.  During the investigation period for

the grievance,[10] McFadden became hostile and verbally abusive toward the medical staff on

---

[8] McFadden states that his refusal to waive his right to be transferred closer to his family, which was over 700 miles away, as a factor contributing to his poor medical treatment.  McFadden Aff. ¶ 151.  To the extent that McFadden argues that he was entitled to this transfer, his argument must be rejected.  See Kivela v. U.S. Att'y Gen., 523 F. Supp. 1321, 1325 (S.D.N.Y.1981), aff'd, 688 F.2d 815 (2d Cir.1982) ("However, there is no constitutional right in favor of a prisoner to have his place of confinement close by or proximate to the location of his friends or relatives or to have any particular place designated for his confinement."); see also Beshaw v. Fenton, 635 F.2d 239, 246 (3d Cir.1980) ( "[W]e are aware of no authority suggesting that a transfer to a facility not easily accessible to a prisoner's relatives ... necessarily implicates liberty interests protected by the Due Process Clause.").

[9] As discussed infra, when McFadden saw an audiologist in the Spring of 2004, it was noted that McFadden's hearing loss had "been greatly exaggerated."  Miller Decl. ¶ 30; Docket No. 169-20 at 45; Docket No. 177-3 at 13-14.

[10]"The IGP [Inmate Grievance Program] is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2)

April 14, 2002, resulting in the termination of McFadden's visit.  Docket 178-4 at 2; Docket No. 178-5 at 82; Docket No. 177-3 at 13.  McFadden stated that he did not wish to begin treatment while still housed in the Special Housing Unit (SHU).[11]  Id.; Miller Decl. ¶ 27.  While the investigation was pending, McFadden corresponded with Dr. Lieb.  Due to McFadden's hostile attitude, Dr. Lieb was granted an order by DOCS precluding McFadden from contacting him.  Docket No. 178-3 at 62-63; Docket No. 178-5 at 79-80.

As of November 16, 2004, McFadden still refused to undergo treatment at Clinton.  Miller Decl. at 45; Docket No. 177-3 at 13-14 31; Docket No. 177-3 at 10.  Instead, he agreed to start treatment only if he was not transferred to another correctional facility before March 2006.  Id.  In January 2005, McFadden was released from SHU into the general prison population and approached by medical staff to begin treatment for his hepatitis.  Docket No. 177-3 at 9; Miller Decl. ¶¶ 34, 40.  McFadden became belligerent and argumentative, accusing the medical department purposely of delaying blood work and test results, and informing them that the courts would decide the future course of McFadden's medical treatment.  Docket No. 177-3 at 9; Miller Decl. ¶¶ 34-35.

---

appeal to the superintendent within four working days of receiving the IGRC's written response, and (3) appeal to the CORC [Central Office Review Committee] ... within four working days of receipt of the superintendent's written response." Abney v. McGinnis, 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted).

[11]SHUs exist in all maximum and certain medium security facilities.  The units "consist of single-occupancy cells grouped so as to provide separation from the general population . . . ."  N.Y. Comp. Codes R. & Regs. tit. 7, § 300.2(b) (2007).  Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required.  Id. at pt. 301.

**ii. Urological Ailments**

On February 23, 2001, McFadden complained of kidney pain which he believed was associated with his tuberculosis treatment. Docket No. 177-3 at 32. On February 27, 2001, blood work showed no evidence of bacteria in his urine, but he was diagnosed with a urinary tract infection. Docket No. 177-3 at 61-61.

On March 22, 2002, Miller gave McFadden a physical noting inter alia that he had no prostate or nodule enlargement. Docket No. 177-3 at 30. On September 24, 2002, McFadden complained of passing blood in his urine for the past week. Docket No. 177-3 at 25. A urine sample was cloudy in appearance. Docket No. 177-3 at 47. The urinalysis showed budding yeast, evidencing another infection. Id. at 47-48. On October 10, 2002, McFadden was seen by Miller complaining of difficulty urinating since August 2001. Docket No. 177-4 at 8, 23. McFadden was referred to a urologist. Id.

On October 24, 2002, during his evaluation with a urologist, McFadden voiced no complaints other than a corrections officer invading his privacy by refusing to leave the room during the consultation. Docket No. 177-4 at 8, 23. The urologist continued to pose questions to McFadden, but because the corrections officer refused to leave for reasons of security, McFadden refused to answer any questions. Id. The urologist offered to continue the evaluation at another date and time if McFadden would consent to receiving treatment in an appropriate security setting. Id.[12]

_____

[12] McFadden also claims violations of his right to medical confidentiality because Lareau refused to leave the treatment room. McFadden Aff. ¶¶ 88-91. Lareau claimed that the urologist requested the corrections officer remain in the room for security reasons and that the urologist was within his rights to make such a request. Lareau Decl. (Docket No. 169-6) ¶ 6. Lareau claims that he attempted to persuade the physician to agree to evaluate McFadden without him in the room, which the urologist refused. Id. ¶ 7. The

11

On February 21, 2003, McFadden requested another urinalysis because there was blood in his urine.  Docket No. 177-3 at 22.  On September 15, 2003, McFadden again complained of blood in his urine but requested not to go back to the urologist due to the problems he had experienced there.  Id. at 21.  Laboratory tests were performed a week later showing that McFadden had E. Coli requiring treatment with Cipro.  Docket No. 177-3 at 20. On December 18, 2003, McFadden was again referred to the urologist.  Docket No. 177-3 at 72.  McFadden was diagnosed with a normal prostate.  Id.  A cystoscopy was scheduled.  Id.

On January 28, 2004, McFadden was seen at a follow-up appointment after his cytoscopy and referred to see another specialist.  Docket No. 177-3 at 70.  On March 19, 2004, McFadden was diagnosed with prostatitis and a bladder neck obstruction and was prescribed Flomax.  Docket No. 177-3 at 15, 70.  On March 14, 2004, McFadden received correspondence directing that if he wished a refill of his Flomax, he was to leave the refill slip or medical services request so that it could be picked up and delivered to the pharmacists in the morning.[13]  Docket No. 178-3 at 59; Docket No. 178-5 at 76; Miller Decl. ¶ 43.  On April 2, 2004, McFadden received a refill of his prescription despite his failure to submit a sick call slip.  Docket No. 177-3 at 14.  McFadden received his prescription from that point on as the refills were filled and no further complaints were noted.  Docket No.

---

urologist stated that he was advised by Lareau that the corrections officer needed to remain in the room for security reasons and that Dr. Lieb deferred to the judgment and authority of Lareau.  Lieb Aff. ¶ 3.  McFadden returned to the clinic on January 22, 2004, where the corrections officer did not remain in the examination room and McFadden consented to, and received, a full medical examination.  Id.  ¶ 4; McFadden Aff. ¶ 95.

[13] McFadden claims Miller, Lee, and Tousignant never informed him that it was his responsibility to request refills for prescriptions.  McFadden Aff. ¶ 129.

177-3 at 10-12; 178-6 at 43.  However, McFadden "was not compliant with taking his Flomax as directed and obtaining refills when necessary."  Miller Decl. ¶ 43.

On June 9, 2004, McFadden again complained of pain after urination.  Docket No. 178-6 at 44.  McFadden indicated that he might be transferred soon and the medical staff continued him on Flomax.  Id.  A urinalysis was conducted the following day, medication was prescribed, and McFadden was advised to increase his fluid intake.  Id. at 43.  McFadden was scheduled to have a urology consult on June 17, 2004 but refused to go and signed a refusal of medical treatment form.  Id.

### iii. Hearing Impairment

McFadden claims that maltreatment for his chronic ear infections resulted in permanent hearing loss. Docket No. 169-20 at 143.  On August 11, 2000, McFadden complained of hearing loss in his left ear following an ear infection.  Docket No. 177-3 at 35.  During a follow-up appointment on August 25, 2000, it was noted that McFadden was feeling good and subjectively describing himself as very happy.  Id.  However, on November 2, 2000, McFadden complained of an earache again.  Docket No. 177-3 at 34.  McFadden argued with staff.  Id.  On or about November 20, 2000, McFadden was evaluated for bilateral hearing loss.  Docket No. 169-20 at 40, 80, 94.  An appointment was made with a specialist.  Id.  McFadden was seen two more times by medical staff before being evaluated by a specialist who recommended an audiogram and regular follow-up appointments.  Id. at 41, 75, 89.  The audiogram was conducted on December 14, 2000.  Id. at 42, 78, 92.  McFadden was fitted for hearing aids a few days later.  Id. at 39, 82, 96.

In early January 2001, the batteries in McFadden's hearing aids were replaced and

13

no changes to his health were noted.  Docket No. 169-20 at 38, 79, 83, 93, 97.  While a

follow-up appointment was scheduled with a specialist for January 16, 2001, it was

cancelled with direction to reschedule if any problems surfaced.  Id. at 143.  Three days

later, McFadden complained that he was not receiving appropriate medical care for his

hearing impairment.  Id. at 122-23.

Within a week after receiving the complaint, McFadden was interviewed and stated

that he had (1) hearing aids, (2) an audiology consultation concerning an ear infection but

had not complained any further about his hearing, and (3) never requested reasonable

accommodations to either medical or guidance staff.  Docket No 169-20 at 115-17.  On

January 29, 2001, McFadden received a letter directing him to consult the medical

department about his hearing since there was no evidence to indicate that he had

experienced hearing difficulties or was seeking any accommodations.  Id. at 110-13;

Raymond Decl. (Docket No. 169-16) ¶ 4.  After the medical determination confirmed

moderate hearing loss, McFadden was provided appropriate hearing aids.  Raymond Decl.

¶ 5.

On or about  March 13, 2001, McFadden complained that he was denied reasonable

accommodations because he was unable to wear his hearing aids during rest time and was

unable to hear the bell or loud speakers, leading to unwarranted misbehavior reports.

Docket No. 169-20 at 103-04.  The grievance was denied as (1) the block officer denied

knowledge that McFadden had a hearing impairment, (2) McFadden could not specifically

identify any officers or witness, and (3) McFadden had been seen by multiple medical

professionals since 2000 and, although he had moderate hearing loss, he had been

provided with hearing aids and had never requested any accommodations.  Id. at 102, 105-

07.  McFadden appealed the denial.  Id. at 109.

On March 13, 2001, a request was submitted for hearing aid, batteries, and a telephone amplifier, which was immediately approved.  Docket No. 169-20 at 76, 90. McFadden's records were evaluated by multiple specialists with mixed results as to the severity of McFadden's impairment, resulting in a new audiogram being ordered.  Id. at 69-72.  An assessment from Eastern Correctional Facility on March 27, 2001 indicated that McFadden's hearing was within normal limits, he responded consistently and appropriately to conversational and lower level speech, his reflexes were normal and required no special intervention, and his overall diagnosis was that his hearing abilities were within normal limits and functioning appropriately.  Id. at 60, 64, 68.

On May 3, 2001, a second audiogram was performed.  Docket No. 169-20 at 61-62, 65-66.  The results indicated that McFadden had severely exaggerated his hearing loss and he was not a special need or accommodation candidate.  Id. at 61, 65, 63.  Thus, only his hearing aids and batteries were approved for his functional hearing impairment, but the telephone and television amplifiers were denied based on the audiology report.  Id. at 25-26, 58; see also Docket No. 177-3 at 31.  McFadden appealed the denial, which was affirmed on June 15, 2001.  Docket No. 169-20 at 24. On June 28, 2001, McFadden filed a grievance concerning the denial of the accommodations he requested.  Docket No. 169-20 at 55.  The grievance was denied based upon the audiology results.  Id.  McFadden appealed the denial, which was ultimately upheld on August 29, 2001.  Id. at 56.

In late February 2002, McFadden requested that the volume in the hearing aids be increased.  Docket No. 169-20 at 34.  Miller questioned the need for amplification and McFadden was evaluated by an audiologist on March 8, 2002.  Id.  However, on March 22,

2002, McFadden stated that his ears felt better.  Docket No. 177-3 at 30.  McFadden was given a new hearing aid.  Docket No. 169-20 at 32-33.  In May, McFadden was suffering from persistent ear infections and requested and received new molds for his hearing aids.  Id. at 29, 31.  McFadden nevertheless complained of increased hearing loss on his left side and requested another increase in amplification.  Id. at 30-31.  McFadden had follow-up appointments on the new hearing aids and their comfort and fit in July and August, a new hearing aid was given to McFadden in September, and a further follow-up a few weeks later.  Id. at 27-28, 30, 43-44; see also Docket No. 177-3 at 24 ("[McFadden] shows inconsistent results on audiogram from [May 31, 2001]. Suspect functional component to hearing loss.").  No further complaints were made until February 2003.  Docket No. 169-20 at 51.

On February 21, 2003, McFadden stated his hearing aids were no longer functional.  Docket No. 177-3 at 22.  McFadden was seen April 4, 2003 to evaluate his complaints of decreased hearing.  Docket No. 169-20 at 52.  In July and December, McFadden was provided with new batteries for his hearing aid.  Docket No. 177-3 at 18, 21.  Additionally, in October, McFadden complained of damage to his hearing aid which required replacement.  Docket No. 177-3 at 20.

On February 19, 2004, McFadden filed a grievance concerning his hearing impairment and indicated he was awaiting a decision from the medical staff concerning his requests for accomodations.  Docket No. 169-20 at 6, 11.  A few days later, McFadden filed another grievance alleging that his hearing officer refused to allow him reasonable accommodations for his hearing difficulties.  Id. at 21. Both grievances were denied, citing McFadden's possession of hearing aids, the absence of special needs or accommodations

16

and McFadden needed to consult medical staff for his complaints.  Id. at 5, 7-9, 12, 18-20, 22-23.  McFadden was recommended to undergo another audiology examination.  Id. at 57; see also Docket No. 178-6 at 19.  McFadden was tested on April 7, 2004.  Docket No. 169-20 at 46-47.  McFadden had a mild hearing loss but was able to hear conversations at low levels and was not a candidate for special accommodations.  Id. at 45; Docket No. 177-3 at 13-14.  McFadden continued to wear his hearing aids which had been malfunctioning and had since been repaired.  Docket No. 169-20 at 2, 14, 45; Docket No. 177-3 at 13-14.[14]

On February 29, 2005, McFadden lodged another grievance stating that two months earlier, all his hearing aids had been seized in a cell search and that the corrections staff refused to give him the hearing aids back.[15]  Docket No. 169-20 at 133; Docket No. 177-3 at 9, 23; Docket No. 178-4 at 8; Docket No. 178-5 at 43; Docket No. 178-6 at 10.  An investigation and interview with McFadden revealed that medical staff confiscated four hearing aids from his cell, was currently attempting to identify them, and that McFadden was scheduled to see the audiologist again.  Docket No. 169-20 at 132, 134; Docket No. 177-3 at 9, 23; Raymond Decl. (Docket No. 169-19) ¶¶ 5-7.  McFadden's grievance was denied as the search and confiscations were warranted as contraband in his cell and medical staff had accommodated his hearing impairment by reissuing one of the hearing

---

[14] McFadden alleged that Officers Barrier and Bushy placed glass in his food in an act of retaliation for complaining about the refusal to provide medical care.  See generally Docket No. 178-5 at 38-41.  However, these individuals are not named as defendants and these claims, therefore must fail.  Even if these individuals remained in the action, there is no evidence proffered other than McFadden's conclusory allegations to support these contentions.

[15] In his grievance, McFadden also stated that his eyeglasses were confiscated and destroyed.  Docket No. 169-20 at 133.  However, there is no evidence that eyeglasses were even found in his cell.  Id. at 136-37.

aids back to McFadden.  Docket No. 169-20 at 132, 135-37.  McFadden appealed the

grievance but to no avail as it was affirmed on March 2, 2005.  Id. at 131.

McFadden lodged another complaint on January 9, 2007 that his hearing aids were

malfunctioning and that the medical staff had ignored his requests to see a specialist.

Raymond Decl. ¶ 9;  Docket No. 169-20 at 141, 143.  McFadden was directed to see his

primary care provider for an examination to determine if referral to a specialist was

appropriate.  Id. 141; Raymond Decl. ¶ 9.  McFadden never contacted the medical

department. Id. ¶ 9.


### B. Conditions of Confinement

On March 18, 2004, when McFadden was transferred to SHU, there was

construction occurring on the unit.  McFadden Aff. ¶¶ 119-20.  The construction included

the chemical removal of paint from the walls and floors.  Id.  ¶ 120.  The heaters were not

working, and the inmates allegedly threw human waste and food at each other and the

corrections officers.  Id.  ¶ 120; Menard Decl. (Docket No. 169-10) ¶ 3.  McFadden

contends that this area was reserved for "mentally disturbed inmates."  McFadden Aff. ¶

120.

McFadden also lodged numerous grievances during his time in SHU at Clinton.[16]

McFadden a addressed some of these concerns to defendant Annucci, then the DOCS

---

[16] On August 13, 2004, McFadden received a letter from Capt. LaValley regarding to McFadden's complaints about the cleanliness of the SHU shower areas and the retrieval of his personal property.  Docket No. 178-5 at 84.  LaValley indicated that the SHU Security Supervisor indicated that the showers were cleaned but that if McFadden found them otherwise, he should contact the SHU area supervisor.  Id.

Deputy Commissioner and Counsel, who visited McFadden, observed but ignored the conditions, and failed to uphold McFadden's constitutional right to be free from cruel and unusual incarceration.  McFadden Aff. ¶¶ 147-48.  Annucci asserts that while he visited Clinton, the visit was not "based on the complaint of one specific inmate" because Annucci had neither the time nor ability to investigate and speak with every inmate personally concerning grievances.  Annucci Affirm. (Docket No. 169-5) ¶¶ 6-7.  While Annucci does not specifically remember McFadden, he recalls a visit to Clinton's SHU at the approximate time McFadden lodged his complaints but did not observe anything which would indicate that the inmates' constitutional rights were being infringed.  Id.  ¶ 9-10.

### C. False Accusations

McFadden contends that he was subjected to a urinalysis based on false claims that a confidential informant had apprised Sgt. Douglas that McFadden was using narcotics.  McFadden Aff. ¶ 76.  The urinalysis was in retaliation for McFadden filing grievances against Douglas, Douglas was aware of McFadden's urinary ailments, and this action was intended to cause McFadden great harm and hardship.  Id. ¶¶ 76-77.  On September 23, 2002, Lareau ordered another urinalysis under the same false pretenses, which caused McFadden to begin bleeding when he attempted to urinate.  Id.  ¶ 78.  Lareau then escorted McFadden to his first urology appointment where he continually threatened and harassed McFadden.  Id.  ¶ 82.

Defendants Tamer, Lareau, Lucia, and Armitage falsely accused McFadden of threats and riot on February 14, 2004 in retaliation for McFadden filing McFadden I.  Lareau Decl. ¶ 3; Tamer Decl. (Docket No. 169-7) ¶ 4; Lucia Decl. (Docket No. 169-8) ¶ 3; see also

19

Docket No 178-2 (explaining knives were planted in McFadden's cell while he was out giving rise to the charge).  The three remaining defendants deny ever authoring any false misbehavior reports to be filed against McFadden or engaging in any other retaliatory actions.  Lareau Decl. ¶ 4; Tamer Decl. ¶ 4; Lucia Decl. ¶ 4.

Tedford and Artus retaliated against McFadden for serving summonses and complaints on defendants.  Tedford Decl. (Docket No. 169-9) ¶ 4; Artus Decl. (Docket No.169-11) ¶ 4.  Tedford, encouraged by Artus, allegedly filed a false misbehavior report when McFadden inappropriately contacted the victims of his criminal activity to apprise them of the possibility of a financial settlement in McFadden's pending civil case.  Tedford Decl. ¶ 6; Artus Aff. ¶ 4; McFadden Aff. ¶ 115.  One of the crime victims contacted McFadden's arresting officer, who contacted Clinton, requesting that McFadden be prohibited from corresponding with the victims.  McFadden Aff. ¶ 116.

On March 12, 2004, McFadden was served a misbehavior report for failing to comply with a DOCS directive which required the authorization of Artus as Superintendent prior to contacting any crime victims.  Docket No. 169-12 at 1.  McFadden had not obtained such permission, was found guilty at a disciplinary hearing, and was sentenced to sixteen months in SHU.  McFadden Aff. ¶ 119; Docket No. 169-13 at 1-3.  The sentence was reduced on June 7, 2004 to twelve months.  Docket No. 169-13 at 2; Docket No. 169-14.[17]  Artus further reduced the sentence by three months.  Artus Decl. ¶ 16.

---

[17]On November 10, 2004, McFadden was advised that any communications with the victims of his crime were required to be sent to both the New York State Division of Criminal Justice Services and to the county district attorney, and that one of those parties would notify the victims.  Docket No. 178-3 at 42.

### D. Legal Documents and Personal Property

McFadden alleges that while he was in Sullivan Correctional Facility from October 1994 to August 2000, his legal mail was illegally opened and he was intentionally isolated from his family and friends.  McFadden Aff. ¶ 117.  These violations continued when McFadden was transferred to Clinton.  Id.  ¶ 118.  This deprivation persisted until July 7, 2004.  Id.  ¶ 122.  Specifically, Menard and Tamer used their positions to deny him access to legal supplies, papers, and postage.  Docket No. 178-2 ¶ 175.  Additionally, Menard removed medication from McFadden's cell, interfering with McFadden's medical care.  Menard Decl. ¶ 6.


### E. Sealed Records

In 1970, McFadden was charged as a juvenile in Pennsylvania with an attempted escape.  Docket No. 177-5 at 43-44.  Pursuant to a Decision and Order dated July 31, 2000, the record of that matter was sealed.  Docket No. 177-5 at 41.  McFadden asserts that this information was not properly sealed and has been improperly utilized.  McFadden Aff. ¶¶ 138-140.   On December 7, 2004, Jarvis wrote to McFadden, advising that his DOCS records did not indicate any Pennsylvania investigation or pre-sentence reports.  Docket No. 178-3 at 40.  Jarvis suggested that McFadden contact the Pennsylvania authorities if he needed further information.  Id.


### II. Discussion

McFadden alleges multiple constitutional violations in the consolidated case.

McFadden alleges that (1) his First Amendment rights were violated by defendants retaliating against him for filing various grievances and denying his access to his legal papers and supplies; (2) his Eighth Amendment rights and his rights under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. (ADA), were violated by defendants failure to treat his tuberculosis, urinary ailments, and hearing loss and their failure to diagnose and treat his hepatitis properly; (3) his Eighth Amendment rights were violated by the cruel and inhumane conditions of confinement in the Clinton SHU; and (4) his Fourteenth Amendment rights were violated by the false misbehavior reports that were filed and defendants refusal to seal properly his Pennsylvania juvenile proceedings.  Defendants seek summary judgment on all claims.

## A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine

issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude.  Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally.'" (citations omitted)).  However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.  Anderson, 477 U.S. at 247-48.

## B. First Amendment

### i. Retaliation

McFadden contends that defendants acted in a retaliatory manner when (1) Lareau subjected him to two urinalyses under false pretenses; (2) Tamer, Lareau, and Lucia filed false misbehavior reports for threatening a riot in retaliation for grievances;  and (3) Tedford, encouraged by Artus, filed false misbehavior reports concerning McFadden contacting a

prior victim in an attempt to preclude McFadden from serving summonses and complaints. To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff.  Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).  "Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone."  Jackson v. Onondaga County, 549 F. Supp. 2d 204, 215 (N.D.N.Y. 2008) (citing Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996)).  Additionally, courts must view retaliation claims with care and skepticism to avoid judicial intrusion into prison administration matters. Id.  Conclusory allegations alone are insufficient.  Id. (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983) (explaining that "claim[s] supported by specific and detailed factual allegations . . . ought usually be pursued with full discovery.")).

    In this case, McFadden has failed to allege facts sufficient to support a retaliation claim.  McFadden's actions in filing grievances constitutes an activity protected by the First Amendment.  However, McFadden alleges no facts other than conclusory allegations to demonstrate that the filing of his grievances was a substantial factor in any defendant's filing of his misbehavior reports.  These conclusory allegations, without more, are insufficient to maintain the present claims.  Id.

    Second, even assuming that the actions taken against McFadden were motivated by retaliation, the misbehavior report based on contacting a victim was supported by unrefuted evidence.[18]  As discussed infra, this misbehavior report was filed for valid reasons and did

_____

    [18] There is no evidence in the record pertaining to the alleged threat of riot, the knife, or urinalyses incidents.  As to the urinalyses, there is no information provided to

not violate constitutional provisions.  The misbehavior report stated a violation of DOCS regulations.  Additionally, there were valid penological purposes for disciplining McFadden for violating the regulation against directly contacting the victim.  Moreover, the result of the disciplinary hearing and appeals thereof affirmed McFadden's guilt.

Accordingly, defendants' motion should be granted as to these claims.


### ii. Denial of Access to Courts

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution."  Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003).  In order to state a claim for denial of access to the courts, including those premised on interference with legal mail, a plaintiff must allege "that a defendant caused 'actual injury,' i.e. took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.'"  Id. (citing Monsky v. Moraghan, 127 F.3d 243, 247 (2d Cir. 1997) (quoting Lewis v. Casey, 518 U.S. 343, 351 (1996)).  "[A]n isolated incident of mail tampering is usually insufficient to establish a

---

indicate whether McFadden produced sufficient urine during the first urinalysis either to create or obviate the need for the second or whether the results were positive or negative. Second, despite his conclusory allegations, the urinalyses were warranted.  Drug testing is analyzed under the Fourth Amendment and constitutes an illegal search when it is undertaken to harass.  See Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 614 (1989); Harris v. Keane, 962 F. Supp. 397, 407 (S.D.N.Y. 1997); see also N.Y. Comp. Codes R. & Regs. tit. 7, §1020.4(a)(1), (4), (7), (8); see also Rodriguez v. Coughlin, 795 F. Supp. 609 (W.D.N.Y. 1992) (holding that two random drug tests within a twelve-month period, both negative, did not constitute a constitutional violation).  However, when corrections officers are provided information from a reliable confidential informant, there is reasonable cause  to believe that an inmate requires a urinalysis.  N.Y. Comp. Codes R. & Regs. tit. 7, §1020.4(a)(1), (4), (7), (8).  As McFadden was tested based on information provided by a confidential informant, the test was based on reasonable cause.

25

constitutional violation . . . . Rather, the inmate must show that prison officials regularly and unjustifiably interfered with the incoming legal mail." Id. (citations omitted); see also Washington v. James, 782 F.2d 1134, 1139 (2d Cir. 1986) (explaining that an action may not give rise to damages if there was "no showing . . . that the inmate's right of access to the courts was chilled or the legal representation was impaired."); Morgan v. Montanye, 516 F.2d 1367, 1371 (2d Cir. 1975) (holding that a single instance of mail tampering which did not lead the plaintiff to suffer any damage was insufficient to support a constitutional challenge).

McFadden alleges that (1) Menard and Tamer denied him access to legal supplies, papers, and mail; and (2) Tedford and Artus placed him in SHU to preclude him from effecting service on parties in a lawsuit. However, McFadden has failed to allege or show how defendants' actions caused him actual injury. McFadden proffers only conclusory allegations, failing entirely to contend what injury he suffered as a result of the alleged tampering with his legal mail and supplies. Even viewing the facts in the light most favorable to McFadden, no discernable damage or injury has been shown. Thus, McFadden has failed to prove any prejudice to any other legal proceeding on this claim. See Gonzalez-Cifuentes v. Torres, No. 04-CV-1470 (GLS/DRH), 2007 WL 499620, at *6 (N.D.N.Y. Feb. 13, 2007) (stating that plaintiff "identifies no particular case or claim which was impeded or how any defendant's conduct impeded his litigation of a claim or defense [and h]e has thus failed sufficiently to allege any actual injury from this alleged incident, much less that [the] conduct was deliberate and malicious.") (internal citations and quotations omitted).

McFadden contends that his SHU sentence was an intentional ploy to prevent him

26

from serving summonses and complaints on defendants.  McFadden fails to allege which

defendants and which case was hindered by these defendants.  Therefore, he again fails to

allege what actual injury he suffered.  Even if he did identify a defendant and claim, it would

be of no consequence since SHU inmates remain able to effect service of process.  Artus

Decl. ¶ 18; Tedford Decl. ¶ 9.  Pro se prisoners proceeding in forma pauperis (IFP), such as

McFadden, rely on the United States Marshals Service for service of process.  Fed. R. Civ.

P. 4(m); see also Puett v. Blandford, 912 F.2d 270, 275 (9th Cir. 1990); Sellers v. United

States, 902 F.2d 598, 603 (7th Cir. 1990).  Nothing in the record indicates that McFadden

was in inhibited his ability to provide the necessary filings and information to the Marshals

Service or court clerk.  Thus, even viewing the facts in the light most favorable to

McFadden, there is no indication that any of defendants' actions caused McFadden any

injury or harm.[19]

Therefore, any claims concerning denial of access to the courts are insufficient and

defendants' motion as to these claims should be granted.

## C. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual

punishment."  U.S. Const. amend. VIII.

---

[19]Furthermore, to the extent McFadden attempts to utilize this case as an example of how service was precluded, his assertions are discredited by this Court's Decision and Order dated July 11, 2005, which denied defendants' motion for summary judgment based on service of process.  Docket No. 81.

**1. Medical Care**

The Eighth Amendment encompasses the provision of medical care.  <u>Hathaway v.</u> <u>Coughlin</u>, 37 F.3d 63, 66 (2d Cir. 1994) (citations omitted).  A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need.  <u>Wilson v. Seiter</u>, 501 U.S. 294, 297 (1991); <u>Hathaway</u>, 37 F.3d at 66.  More than negligence is required "but less than conduct undertaken for the very purpose of causing harm."  <u>Hathaway</u>, 37 F.3d at 66.  The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need.  <u>Chance v.</u> <u>Armstrong</u>, 143 F.3d 698, 702 (2d Cir. 1998).  Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm.  <u>Id.</u>  "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  <u>Farmer v. Brennan</u>, 511 U.S. 825, 844 (1994).


**i. Serious Medical Need**

"'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim.  <u>Smith v. Carpenter</u>, 316 F.3d 178, 184 (2d Cir. 2003)(quoting <u>Hudson v. McMillian</u>, 503 U.S. 1,9 (1992)).  Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of

comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain."   Brock v. Wright, 315 F.3d 158, 162-63 (2d Cir. 2003)(citing Chance, 143 F.3d at 702).  The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case.  Smith, 316 F.3d at 185.

McFadden has demonstrated a serious medical need.  All of his conditions, alone and in combination, are sufficiently serious.  See Chernish v. Mass. Mut. Life Ins. Co., No. 08-CV-957 (GHL), 2009 WL 385418, at *3 n.11 (N.D.N.Y. Feb. 10, 2009) ("[N]umerous decisions, from district courts within the Second Circuit alone, have found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment.") (citations omitted); Kimbrough v. City of Cocoa, No. 05-CV-471, 2006 WL 2860926, at *3 (M.D. Fla. Oct. 4, 2006) (blood in the urine); Rivera v. Goord, 119 F. Supp. 2d, 327, 332 (S.D.N.Y. 2000) (partial hearing loss); Maldonado v. Terhune, 28 F. Supp. 2d 284, 290 (D.N.J. 1998) (tuberculosis).  Additionally, even if there exists a dispute whether any ailment alone will suffice, the ailments taken together suffice to warrant immediate medical attention from any reasonable person or physician.  McFadden has thus satisfied this prong of these claims.

### ii. Deliberate Indifference

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs."  Chance, 143 F.3d at 702.  Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  Estelle v. Gamble, 429 U.S.

29

97, 104 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. Id. at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists . . .  are not adequate grounds for a § 1983 claim." Magee v. Childs, No. 04-CV-1089 (GLS/RFT), 2006 WL 681223, at *4 (N.D.N.Y. Feb. 27, 2006). Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996).

### a. Tuberculosis

McFadden has failed to prove that any defendant exhibited deliberate indifference to his care. After he was diagnosed with tuberculosis in 1995, McFadden was treated for the illness by DOCS medical staff and specialists numerous times. McFadden was started on INH treatment at least three times in a five-year period. Docket No. 177-3 at 35, 42; Docket No. 177-4 at 7, 18-19; Docket No. 178-6 at 21. The long lapses in treatment were not attributable to medical staff inattention but to McFadden's continuous refusals to submit to prescribed testing and treatment. Medical staff continued to offer the treatment and to counsel McFadden after he (1) twice refused the treatment after commencing it (Docket No. 177-3 at 42; Docket No. 177-4 at 17-18, 42-43), (2) refused to have his blood tested on multiple occasions (Docket No. 177-3 at 43, 64), (3) stated that he preferred to undertake his own holistic methods of treatment (Docket No. 177-3 at 42; Docket No. 178-6 at 21), and (4) refused to allow medical staff to examine him (Docket No. 177-3 at 37, 40). Additionally, despite McFadden's resistance to the medical department, they still continued

30

to counsel him on the risks, benefits, and alternatives to the INH therapy, and the dangers of leaving his tuberculosis untreated as well as changing his tuberculosis treatment from INH to Refampin when it appeared that the side effects were too great for McFadden. Docket No. 177-3 at 7, 33, 37, 38.

The same occurred with McFadden's Refampin treatment, with McFadden commencing and unilaterally refusing the Refampin treatment and blood work, and medical staff continuing to treat, counsel, and attempt to convince McFadden to complete the treatment cycle.  Docket No. 177-3 at 31, 56-59.  Thus, despite McFadden's conclusory, unsupported, and refuted allegations that the medical department did not appropriately diagnose or treat his tuberculosis, all objective medical evidence in the record demonstrates that medical staff were neither deliberately indifferent to nor intentionally delaying McFadden's treatment.  Therefore, he has failed to meet the subjective standard here.

McFadden asserts that during his years of treatment, defendants should have been alerted to his high risk status for becoming infected with Hepatitis C as well.  As previously discussed, although McFadden's liver enzyme profiles were elevated, it was logically explained as a side effect of the INH treatment and the liver enzyme profiles were never high enough to trigger alarm as to the INH treatment or his potential carrier status for Hepatitis.  Miller Decl. ¶¶ 49-50.

Additionally, since tuberculosis was positively identified and posed the greater risk, it was reasonable and medically indicated that defendants ascribe priority t their treatment of the tuberculosis.  Id. ¶¶ 45-46.  At worst, defendants' conduct would constitute no more than mere negligence if they should have been more attune to the potential for McFadden contracting hepatitis or a mere disagreement over the proper course of treatment.  Either

31

conclusion is insufficient to establish an Eighth Amendment violation.

### b. Hepatitis C

As with his tuberculosis claim, McFadden cannot establish deliberate indifference based on his hepatitis treatment.  Immediately after McFadden was diagnosed, Miller (1) counseled him on the DOCS policies regarding the treatment of hepatitis, the risks, benefits, side effects, and alternatives of the interferon; and (2) scheduled all the requisite diagnostic tests and specialist examinations McFadden would require before being eligible to receive the interferon.  Miller Decl. ¶¶ 12-15, 30.  Again, it is undisputed in the record that McFadden's actions, not any defendant's, delayed his eligibility date for treatment as McFadden (1) threatened the medical staff on multiple occasions (Id.  ¶ 17; Docket No. 177-3 at 28), (2) refused medical treatment on multiple occasions (Docket No. 177-3 at 27; Miller Decl. ¶ 20-21), (3) refused to commence the interferon for a plethora of nonsensical reasons ranging from fear of side effects to wanting to cure himself with herbal supplements (Miller Decl. ¶ 21, 25; Docket No. 177-4 at 13; Docket No. 178-6 at 19), and (4) engaging in multiple hunger strikes while denying all medical care (Docket No. 177-4 at 10; Docket No. 178-6 at 19).

Despite McFadden's obvious contempt for the medical department in general and Miller in particular (McFadden Aff. ¶ 94), Miller continued to (1) counsel McFadden on the interferon (Miller Decl. ¶ 25, 30; Docket No. 177-4 at 5), (2) answer questions and explain what caused hepatitis (Miller Decl. ¶ 18), (3) arrange appointments with specialists (Miller Decl. ¶ 20, 22, 30; Docket No. 177-3 at 3, 22; Docket No. 177-4 at 5), and (4) schedule mandatory diagnostic tests (Docket No. 177-3 at 26, 52-53).  Additionally, despite

McFadden's resistance, he was successfully scheduled for an HIV test and liver biopsy.
Docket No. 177-3 at 52-53, 69, 71.

Contrary to McFadden's conclusory statements indicating that defendants refused to
provide appropriate medical care, the medical and diagnostic records conclusively
demonstrate that defendants acted reasonably to treat McFadden's hepatitis despite his
combative and resistant conduct.  Thus, even viewing the evidence in the light most
favorable to McFadden, there is nothing in the record to support his claim here.


### c. Urological Ailments

McFadden contends that defendants denied him appropriate treatment for his
urological problems and delayed treatment and diagnosis of his ailments for months.  The
medical records indicate otherwise.  In early February 2001, McFadden complained of
kidney pain.  Docket No. 177-3 at 32.  McFadden was evaluated and voiced no further
complaints despite multiple encounters with the medical department until September 24,
2002.  Docket No. 177-3 at 25, 61.  McFadden was diagnosed with a urinary tract infection.
Id. at 47-48.  A month later, McFadden was seen for another urinary complaint where he
indicated that he had been in pain for a year although his health record failed to indicate
this.  Docket No. 177-4 at 8, 23.  McFadden was referred to a urologist immediately.  Thus,
when it appeared that McFadden's symptoms were persisting, he was immediately referred
to a specialist.

McFadden was seen by the specialist within two weeks but  declined treatment
because he objected to the presence of the escorting officer despite the urologist's
willingness to proceed with the examination, or any time in the near future when McFadden

could comply with the safety precautions.  Docket No. 177-4 at 8, 23.  Defendants cannot

be blamed for McFadden's refusal of treatment by the specialist.[20]  The corrections officer

was present solely to provide security in the interests of both the inmate and physician as

McFadden had a history of conflict with medical professionals.  Lareau Decl. ¶¶ 6-7; Lieb

Decl. ¶¶ 3-4; see also Docket No. 177-5 at 30 (explaining that inmates have a right to

privacy in the hospital and confidentiality in the information and records regarding care);

Hunter v. Amin, 2008 WL 4283219, at *12 (S.D.Ill. Sept. 17, 2008) (denying claim that

corrections officer should not have remained in the room during a mental health

examination).  Lareau's presence was not intended to, and did not, deliberately interfere

---

[20] Liberally construing the complaint, McFadden has also alleged a violation pertaining to the disclosure of his medical records.  Claims surrounding disclosure of confidential medical information have been analyzed under both the Eighth and Fourteenth Amendments.  See generally Rodriguez v. Ames, 287 F. Supp. 2d 213, 218-21 (S.D.N.Y. 2003).

As of 1999, prisoners retained a right to privacy for medical information unless (1) disclosure was reasonably related to legitimate penological interests or (2) the information contained in the medical records was not constitutionally protection.  See Powell v. Schriver, 175 F.3d 107, 111-13 (2d Cir. 1999); see also Rodriguez, 287 F. Supp. 2d at 219-20 (upholding Fourteenth Amendment protection where the prisoner "has an unusual medical problem which, if disclosed unnecessarily to other inmates, would likely expose plaintiff to discrimination, intolerance, or potential violence," or where the information "spread through 'humor or gossip.'") (quotations omitted); Webb v. Goldstein, 117 F. Supp. 2d 289, 298-99 (E.D.N.Y. 2000) (dismissing a Fourteenth Amendment claim because the prisoner "has not alleged that his prison records contained the sort of sensitive medical information at issue in . . . Powell."); Khalfani v. Sec., Dep't of Veterans Affairs, No. 94-CV-5720 (JG), 1999 WL 138247, at *6 (E.D.N.Y. Mar. 10, 1999) ("The records at issue in this case contained rather mundane information regarding [plaintiff]'s tendon avulsion, his physical therapy and limitations on his ability to work-not the type of deeply personal information that was at issue in prior cases.").

Here, information concerning McFadden's prostate and bladder problems was not the kind expected to invite discrimination, intolerance, or violence.  Additionally, the corrections officer was upholding a legitimate penological interest by providing security for both McFadden and the physician as McFadden was believed prone to volatility with medical professionals.  Accordingly, to the extent that McFadden has alleged a claim on this ground, it is without merit.

34

with or delay the medical treatment McFadden should have received.  Rather, it was

McFadden's uncooperative attitude and refusal to participate in the doctor's questioning and

examination.

    According to the voluminous medical records, McFadden neither consented to nor

requested another urology visit, until December 18, 2003.[21]  Docket No. 177-3 at 22.

During this and a follow-up visit, diagnostic testing was scheduled and McFadden was

prescribed medication and diagnosed with prostatitis and a bladder neck obstruction.

McFadden did not state any further complaints until June 2004.  Docket No. 178-6 at 43-44.

While McFadden may have disagreed with the provision of treatment, it remains that his

referrals were timely and he was adequately evaluated and treated.

    Accordingly, defendants' motion should be granted on this ground.


### d. Prescription Refills[22]

    McFadden claims the d Miller, Lee, and Tousignant did not properly inform

him how to refill his Flomax prescription.  Documentary evidence shows that shortly after

being diagnosed with prostatitis and a bladder neck obstruction, McFadden received a letter

directing him to leave a prescription refill slip with the medical staff for the pharmacists to

---

[21] McFadden visited the medical staff with complaints of blood randomly appearing in February 2003 but did not request to see the urologist or his primary care physician. Docket No. 177-3 at 22.  Additionally, McFadden was referred to the urologist in September but refused.  Id. at 21.

[22] McFadden alleges that Menard removed an unidentified medication from his cell. Menard Decl. ¶ 6.  There are no facts proffered to identify what medication was taken, when it was taken, whether it was justifiably taken, or whether it was returned to McFadden.  Thus, any claim based on these allegations must fail.

refill his request.  Docket No. 178-3 at 59; Docket No. 178-5 at 76; Miller Decl. ¶ 43.

Medical records indicate that the first month that a refill was due, McFadden failed to fill out

the request properly but that his prescription was nonetheless refilled.  Docket No. 177-3 at

14.  Defendants were thus neither deliberately denying nor interfering with McFadden's

prescription because, even though he did not follow the proper procedure, defendants still

refilled the prescription.

After the initial refill, McFadden's medical record reveals no further complaints about

prescription refills.  Additionally, the medical record confirms that McFadden continued to

receive his prescription despite the fact that McFadden was not compliant with taking his

medication or obtaining refills when necessary.  Docket No. 177-3 at 10-12; 178-6 at 43;

Miller Decl. ¶ 43.  Thus, even if a refill was initially delayed in the first month, the fact that

there were no other problems for the duration of McFadden's incarceration demonstrates

no more than mere negligence by defendants on a single occasion.  Such negligence is

insufficient to maintain an Eighth Amendment claim.

Thus, defendants' motion should be granted on these grounds.


### e. Hearing Impairment[23]

McFadden alleges that persistent ear infections resulted in permanent hearing loss.

McFadden began complaining of hearing problems in August 2000.  Docket No. 177-3 at

---

[23] Defendants argue that it is unclear whether McFadden's hearing impairment was a cause of action pursuant to the ADA or § 1983.  In light of the special solicitude to which McFadden is entitled as a pro se litigant, it will be assumed that he pursues claims under both and, because claims under both statutes fail on the record presented here, defendants' motion should be granted as to McFadden's claims under both statutes.

35.  McFadden was seen three times in the next four months and then referred to a specialist.  Docket No. 169-20 at 40, 41, 75, 80, 89, 94; Docket No 177-3 at 34.  The specialist recommended an audiogram, which was conducted within a few weeks, and resulted in McFadden receiving hearing aids.  Id. at 39, 41, 42, 75, 78, 82, 89, 92, 96.  Less than four months transpired between the initial complaint and the receipt of hearing aids.  This response and treatment refutes any claim that defendants delayed or withheld any treatment in this period.

On January 19, 2001, McFadden began complaining about the medical treatment that he was receiving.  Docket No. 169-20 at 143.  Within a week, an investigation was conducted and revealed that McFadden was already provided a specialist visit, audiogram, and hearing aids, and that he had never requested any accommodations for his hearing loss.  Docket No. 169-20 at 115-17.  On January 29, 2001, McFadden received a response directing him to consult with the medical department about his hearing difficulties as any requests for accommodations needed to be deemed medically necessary by the medical department prior to the accommodations being granted.  Id. at 110-113; Raymond Decl. ¶ 5.  After a medical determination, McFadden was accommodated with hearing aids.  Raymond Decl. ¶ 5.  As the undisputed facts demonstrate, defendants ensured that, McFadden's complaint was filed and that McFadden was given the appropriate medical attention and diagnostic testing.  As to these claims, then, no evidence has been presented to support McFadden's claims of deliberately indifferent.

In March 2001, McFadden began complaining that he was being denied accommodations again because he was unable to wear his hearing aids while sleeping and could not hear the warning bells.  Docket No. 169-20 at 103-04.  His grievance was denied

because, amongst other things, McFadden had been seen multiple times by medical professionals and had never requested any accommodations.  Id. at 102, 105-07.  The denial was appealed and affirmed.  Id. at 109.

Later in March, McFadden requested hearing aid, batteries, and a telephone amplifier.  Docket No. 169-20 at 76, 90.  Specialists questioned the validity of McFadden's audiology results, retested him, and discovered that McFadden's hearing was within normal limits, his reflexes were normal, he responded consistently and appropriately to conversational and lower level speech, and was not a special needs or special accommodations candidate.  Id. at 60-65, 69-72.  McFadden was allowed to retain his hearing aids but was denied the telephone and television amplifiers.  Id. at 25-25, 58.  The record thus demonstrates without contradiction that in March and May, the medical staff granted the accommodations to McFadden until they could thoroughly investigate the inconsistent audiology results.  Therefore, defendants provided the maximum amount of medical care when in doubt and pared back the accommodations when the medical evidence demonstrated reduced necessity.  No evidence of deliberate indifference has been presented here.

In late February 2002, McFadden began complaining again about his hearing aids and their volume.  Docket No. 169-20 at 34.  While Miller questioned the need for further amplification, McFadden stated that his ears were improving.  Docket No. 177-3 at 30.  In April, McFadden was seen by medical staff for another follow-up and was given a new hearing aid.  Docket No. 169-20 at 32-33.  A month later, McFadden had new hearing aid molds fitted.  In July and August, the comfort and fit of the hearing aids were examined.  In September, McFadden was provided a new hearing aid.  No further complaints were made

for a year.  Docket No. 169-20 at 27-33, 43-44, 51.  Thus, the record demonstrates without question that defendants were actively evaluating McFadden whenever he complained of pain or discomfort in his ears, conformed his hearing aids to McFadden's demands, and constantly provided follow-up care.  This does not rise to a level of deliberate indifference.[24]

In December 2004, McFadden's cell was searched, multiple pairs of hearing aids were confiscated, and corrections staff refused to return them to McFadden.  Docket No. 169-20 at 133; Docket No. 177-3 at 9, 23; Docket No. 178-4 at 8; Docket No. 178-5 at 43; Docket No. 178-6 at 10.  The medical staff returned one pair of hearing aids to McFadden and kept the rest, trying to identify the source of the multiple aids.  Docket No. 169-20 at 132, 135-37.  McFadden alleges that the confiscation of his hearing aids amounted to intentional interference with his medical treatment.  However, his medical treatment required at most only one pair of hearing aids.  There existed no need or authorization for additional hearing aids.  For institutional safety, the hearing aids needed to be confiscated.  This did not delay or deny treatment as McFadden was reissued aids.  Any contrary allegations, even taken in the light most favorable to McFadden, are insufficient to demonstrate otherwise.

Therefore, defendants' motion should be granted on this ground.

---

[24] McFadden lodged two more grievances relating to his hearing impairment and waiting for the medical staff to grant his accommodation requests.  Docket No. 169-20 at 6, 11.  Both grievances were investigated, denied, and affirmed on appeal.  Docket No. 169-20 at 5-9, 11-12, 18-23, 45-47, 57.  These grievances also fail, therefore, to demonstrate deliberate indifference by any defendant.

**2. Urinalysis**

Claims challenging random urinalysis may also be asserted under the "Eighth Amendment right to be free from cruel and unusual punishment."  Rodriguez, 795 F. Supp. at 613.   "To be cruel and unusual punishment, conduct . . . must involve more than ordinary lack of due care for the prisoner's interests or safety . . . .  It is obduracy and wantonness, not inadvertence or error in good faith, that characterizes the conduct prohibited by [the Eighth Amendment]."  Kingsley v. Bureau of Prisons, 937 F.2d 26, 31-32 (2d Cir. 1991) (citing Whitley v. Albers, 475 U.S. 312, 319-21 (1986)).  However "[r]andom urinalysis seeks to secure a safer prison environment, so it is difficult to see how [that] . . . constitutes a lack of due care for the prisoner's interests or safety[; therefore,] . . . urinalysis testing, . . . conducted in accordance with established guidelines, cannot be said to constitute obduracy and wantonness."  Rodriguez, 795 F. Supp. at 613 (internal quotations and citations omitted).

Liberally construing McFadden's claim, it thus presents the question whether defendants conducted the random testing pursuant to the established guidelines.  The record contains no indication that any defendant failed to comply with DOCS regulations.  Thus, there is no evidence to support McFadden's claim here.

Accordingly, defendants' motion for summary judgment should be granted on this ground.

**3. ADA Claim**

Title II of the ADA provides that "no qualified individual with a disability shall, by

reason of such disability, be excluded from participation in or be denied the benefits of . . . a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  Title II applies to state inmates. Giraldi v. Bd. of Parole, No. 04-CV-877 (FJS/DRH), 2008 WL 907321, at *5 (N.D.N.Y. Mar. 31, 2008) (citations omitted).  To state a claim under the ADA, an inmate must demonstrate that "(1) he or she is a 'qualified individual with a disability'; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) [the facility that] provides the service, program or activity is a public entity." Clarkson v. Coughlin, 898 F. Supp. 1019, 1037 (S.D.N.Y. 1995); 42 U.S.C. § 12132.

First, defendants are entitled to judgment on this claim as McFadden named only individuals as defendants.  See Abreu v. Merson, No. 07-CV-6491, 2007 WL 4440903, at *1 (W.D.N.Y. Dec. 13, 2007) (holding that individuals cannot be named as defendants in ADA suits in either their official or representative capacities); Fox v. State University of New York, 497 F. Supp. 2d 446, 451 (E.D.N.Y. 2007); Mejia v. Goord, No. 03-CV-124 (LEK/DEP), 2005 WL 2179422, at *6 n.7 (N.D.N.Y. Aug. 16, 2005); Hallet v. New York State Dep't of Corr. Serv., 109 F. Supp. 2d. 190, 199 (S.D.N.Y. 2000).

Second, McFadden has proffered no evidence to establish the second element of this claim.  McFadden offers no evidence of discrimination or that the alleged constitutional violations were motivated by McFadden's hearing loss or other disability.  Third, there is no proof that McFadden was denied any benefits by any defendant to which he was actually entitled.  As discussed supra, each of McFadden's requests for accommodations were investigated, it was determined and confirmed by objective medical evidence that McFadden's hearing problems were grossly exaggerated, and McFadden actually received

41

accommodations from defendants beyond that required for his level of hearing loss.  Thus, McFadden has failed to offer evidence demonstrating the loss of any services.

Accordingly, defendants' motion should be granted on this ground.


### 4. Conditions of Confinement

"The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  Farmer v. Brennan, 511 U.S. 825, 832 (1970); see also Johnson v. Smith, No. 03-CV-1050 (FJS/DEP), 2006 WL 1843292, at *8 (N.D.N.Y. June 29, 2006). As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective . . . and subjective test."  Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996) (citations omitted). Thus, "[c]onditions of confinement only constitute an Eighth Amendment violation if they involve the deprivation of a single identifiable human need or denial of the minimum civilized measure of life's necessities, and the defendants' state of mind was one of deliberate indifference to that deprivation."  Johnson, 2006 WL 1843292, at *9 (citations omitted).

The objective prong can be satisfied by

> conditions of confinement . . . [which] in combination [constitute an
> Eighth Amendment violation] when each would not do so alone . . .
> [such as] when the conditions have a mutually enforcing effect that
> produces the deprivation of a single, identifiable human need such
> as food, warmth, or exercise – for example, a low cell temperature
> at night combined with a failure to issue blankets.

Davidson v. Murray, 371 F. Supp. 2d 361, 370 (W.D.N.Y. 2005) (citations omitted).

However, "[n]othing so amorphous as overall conditions can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." Id. (citing Wilson v. Seiter, 501 U.S. 294, 304-05 (1991)).  The subjective prong requires "a prison official [to] have a sufficiently culpable state of mind . . ., of deliberate indifference to inmate health or safety" Farmer, 511 U.S. at 834 (citations omitted).

McFadden claims that construction which led to the removal of paint with harsh chemicals and doors being left open to circulate air represented a cruel and unusual punishment.  McFadden Aff. ¶ 119-20.  Additionally, McFadden states that the heaters were broken leading to very cold conditions and the showers were unclean. Id. ¶ 120; Docket No. 178-5 at 84.  McFadden's allegations only relate to general conditions and not to any particular deprivation of identifiable human needs.  Moreover, McFadden does not identify any individuals who were responsible for the construction or heating.  Thus, the subjective prong of the analysis cannot be satisfied for any particular defendant.

Accordingly, defendants' motion for summary judgment as to this claim should also be granted.

## C. False Misbehavior Reports

McFadden alleges that defendants issued a false misbehavior report charging that he contacted his crime victim.  The Fourteenth Amendment protects an inmate from the deprivation of a liberty interest without due process.  However, a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." Freeman v. Rideout, 808

F.2d 949, 951 (2d Cir. 1986)).  "There must be more, such as retaliation against the

prisoner for exercising a constitutional right."  Boddie v. Schnieder, 105 F.3d 857, 862 (2d

Cir. 1997) (citing Franco v. Kelly, 854 F.2d 584, 588-90 (2d Cir. 1988)).

As discussed supra, McFadden has failed to establish facts sufficient to allege a

retaliation claim.  Thus, the present claim must also fail.  Moreover, McFadden's claims

here run afoul of the "favorable termination" rule of Heck v. Humphrey, 512 U.S. 477, 487-

87 (1994).  That rule provides that if a determination favorable to the plaintiff in a § 1983

action "would necessarily imply the invalidity of his conviction or sentence," a plaintiff must

prove that the conviction or sentence has been reversed on direct appeal or declared

invalid in order to recover damages under § 1983.  This rule apples to challenges to

procedures used in prison disciplinary proceedings.  Edwards. v. Balisok, 520 U.S. 641

(1997).  There is no evidence that McFadden's disciplinary determination was ever vacated,

only that his sentence was modified from sixteen months to nine months.  Therefore,

because McFadden's recovery of damages here for a false misbehavior report would

necessarily imply the invalidity of the disciplinary conviction, the claim here cannot stand.

Accordingly, defendants' motion should be granted as to this claim.


### D. Conspiracy

Liberally reading McFadden's complaint and pleadings, he alleges that the medical

staff conspired together to violate McFadden's constitutional rights.  "Section 1985 prohibits

conspiracies to interfere with civil rights."  Davila v. Secure Pharmacy Plus, 329 F. Supp. 2d

311, 316 (D. Conn. 2004). To state a claim for relief under § 1985(3), a plaintiff must show:

(1) a conspiracy; (2) for the purpose of depriving, either directly or

indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States.

United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott, 463 U.S. 825, 828-29 (1983); see also Iqbal v. Hasty, 490 F.3d 143, 176 (2d Cir. 2007).  To demonstrate that a conspiracy existed, "the plaintiff must prove a mutual understanding or meeting of the minds to violate [his or] her civil rights."  Salgado v. City of N.Y., No. 00-CV-3667 (RWS), 2001 WL 290051, at *8 (S.D.N.Y. Mar. 26, 2001) (citations omitted).  "In addition, the conspiracy must be motivated by some class-based animus."  Iqbal, 490 F.3d at 176 (citations omitted).

Here, McFadden does not assert any facts giving rise to a conspiracy.  First, McFadden vaguely asserts conclusory allegations relating to an alleged conspiracy among defendants.  This is insufficient.  See X-Men Sec., Inc. v. Pataki, 196 F.3d 56, 71 (2d Cir. 1999).  Second, there are no allegations relating to agreements, or even communications, among the  defendants for the purpose of furthering their alleged conspiracy, or demonstrating an intent to deprive McFadden of his civil rights.

Accordingly, defendants' motion for summary judgment as to this claim should be granted.

### E. Sealed Records

McFadden claims that defendants improperly used information from the sealed Pennsylvania juvenile proceeding.  First, there is generally no constitutionally derived right

45

arising from N.Y CPL § 160.50[25] to keep sealed records private. <u>Palacio v. Goord</u>, No. 03-CV-836, 2008 WL 87551, at *4 (N.D.N.Y. Jan. 7, 2008).  Violations of state law cannot form the basis of a § 1983 claim unless there has also been a constitutional violation. <u>Duchesne v. Sugarman</u>, 566 F.2d 817, 827 (2d Cir. 1977) (citations omitted).  Second, even if a constitutional right existed, defendants complied with its demands.  McFadden has not specified when this information was allegedly used or how it was used. DOCS found no reference to the records from Pennsylvania in its files.  Docket No. 178-3 at 40.  If DOCS did not possess the sealed records, defendants could not have used them.  No contrary evidence has been presented by McFadden.  Thus, no evidence supports McFadden's claim here.

Accordingly, defendants' motion for summary judgment should be granted on this ground.


### D. Qualified Immunity

Finally, defendants claim that even if McFadden's constitutional claims are substantiated, they are entitled to qualified immunity.  Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982); <u>Aiken v. Nixon</u>, 236 F. Supp. 2d 211, 229-30 (N.D.N.Y. 2002) (McAvoy, J.), <u>aff'd</u>, 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003).  However, even if the constitutional privileges "are clearly established, a government actor

---

[25] Section 160.50 outlines the procedures for sealing records of a criminal action which terminated in favor of the accused.

may still be shielded by qualified immunity if it was objectively reasonable for the . . . official to believe that his [or her] acts did not violate those rights." Smith v. City of Albany, No. 03-CV-1157, 2006 WL 839525 *16 (N.D.N.Y. Mar. 27, 2006) (quoting Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights of which a reasonable person would have known were clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230. Here, the second prong of the inquiry need not be reached concerning any of McFadden's claims because, for the reasons discussed above, McFadden has failed to raise a question of fact as to the first prong of the inquiry.

Accordingly, in the alternative, defendants' motion on this ground should be granted.[26]

### III. Conclusion

For the reasons stated above, it is hereby:

**RECOMMENDED** that defendants' motion for summary judgement (Docket No. 169) be **GRANTED**, McFadden's cross-motion for summary judgment (Docket Nos. 177, 178)

---

[26]Because of the disposition recommended herein, defendants' motion on the ground that various defendants were not personally involved in any constitutional deprivations need not be addressed.

**DENIED**, and judgment be entered for all remaining defendants on all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the

foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO**

**OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE**

**REVIEW**.  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892

F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


DATED:  March 5, 2009
       Albany, New York

_David R. Homer_
United States Magistrate Judge